* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. This case is subject to the North Carolina Worker's Compensation Act.
4. On October 13, 2004, plaintiff suffered an admittedly compensable injury to his lower back while he was employed by defendant-employer.
5. An employment relationship existed between plaintiff and defendant-employer, who was self insured on October 13, 1994.
6. Plaintiff's average weekly wage is $650.08, yielding a compensation rate of $433.41 per week.
7. The parties stipulated the following documentary evidence at the Deputy Commissioner's hearing:
 a. Stipulated Exhibit #1: Medical records
 b. Stipulated Exhibit #2: I.C. forms and documents
 c. Plaintiff's Exhibit #1: Social Security documents
 d. Plaintiff's Exhibit #2: photographs of plaintiff's house and bathroom
 e. Defendant's Exhibit #1: DVDs
 f. Subsequent to the Deputy Commissioner's hearing, defendant submitted an affidavit in support of the surveillance videos and report, which is incorporated into the evidence as Defendant's Exhibit #2.
8. The issues before the Full Commission are whether plaintiff is entitled to modifications to his home in order to accommodate his disability; whether plaintiff is entitled to *Page 3 
a second opinion regarding treatment from Dr. Alexander; whether plaintiff has been unreasonably denied prompt and adequate treatment and accommodation of his disability; and whether plaintiff is capable of attempting to look for suitable alternative employment.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 49 years old. He began working for defendant-employer in approximately 1986. On October 13, 1994, plaintiff was employed by defendant-employer as a spiral wrap operator when he injured his lower back while lifting a spool of wire. Plaintiff subsequently presented to Dr. Gregory D. Mieden at Johnson Neurological Clinic and was diagnosed with moderate spondylolisthesis in L5-S1 distribution. Plaintiff's neurologic exam was also positive for a decrease in distribution in the L5 dermatone on the left hand side. Plaintiff was taken out of work and began conservative treatment with pain medication and physical therapy.
2. On December 21, 1994, plaintiff received a steroid injection and by January 10, 1995, he had begun a work conditioning program. Dr. Mieden continued plaintiff in physical therapy, but released him to return to work with a 60-pound lifting restriction and a limitation of eight hours of work per day. Plaintiff was eventually returned to his pre-injury work regimen on February 27, 1995, continuing the 60-pound lifting restriction. Based on this improvement, Dr. Mieden opined that plaintiff had reached maximum medical improvement as of March 7, 1995, and issued a five to ten percent permanent partial impairment rating to his back. *Page 4 
3. On November 20, 1995, plaintiff returned to Johnson Neurological Clinic complaining of low back pain and some cervical pain. The examining physician, Dr. Keith Miller, found no evidence of myelopathy or radiculopathy, but recommended continued pain medication and a return to physical therapy. Plaintiff made improvement in physical therapy, but as of March 11, 1996, Dr. Miller opined that plaintiff would continue to suffer from intermittent back pain, possibly controlled with exercise and medications.
4. Plaintiff continued to treat with Dr. Miller and, on November 10, 1997, he returned to Johnson Neurological Clinic complaining of back pain. Dr. Miller continued plaintiff on Lodine and Skelaxin and wrote him out of work through November 18, 1997. X-rays were ordered and revealed a grade II spondylolisthesis of L5 on S1, which appeared to increase slightly with forward truncal flexion. Comparison measurements suggested a slight increase in the overall amount of listhesis as compared to 1994 examination. On November 17, 1997, Dr. Miller referred plaintiff to Dr. James McDonald of High Point Orthopaedics Sports Medicine for an evaluation and continued plaintiff out of work until the appointment.
5. Plaintiff presented to Dr. McDonald on December 3, 1997. Dr. McDonald recommended physical therapy and continued plaintiff out of work for two weeks. On December 31, 1997, an MRI and epidural steroid injection were ordered. The MRI of the lumbar spine revealed chronic spondylolisthesis of L5 relative to S1. The combined effect of listhesis and bulging of disc at L5/S1 resulted in moderate bilateral foraminal encroachment. Also, the exam showed a mild broad posterior disc bulge at L4-5 from mild foraminal encroachment. Dr. McDonald referred plaintiff to a neurosurgeon to consider fusion and laminectomy.
6. Plaintiff returned to Johnson Neurological Clinic where he was evaluated by Dr. Victoria Neave, who agreed with Dr. McDonald's recommendations. On February 27, 1998, *Page 5 
plaintiff underwent a Gill's procedure, complete L5 laminectomy, complete bilateral foraminotomies with removal of abnormal pars, interarticularis defect and extensive foraminotomies, posterior lateral fusion with autologous iliac crest graft and instrumentation, performed by Drs. Neave and McDonald. Thereafter, plaintiff was referred for physical therapy and, by May 20, 1998, Dr. McDonald allowed him to begin work conditioning four hours per day with a ten pound lifting restriction.
7. Plaintiff was released from Dr. McDonald's care on June 17, 1998, with instructions to see Dr. Neave in the future for ratings, restrictions, and other follow-up. Plaintiff was released to return to work as of July 27, 1998, for four hours a day with restrictions of no lifting over twenty pounds to his waist, no overhead lifting over twelve pounds and no repetitive bending.
8. Plaintiff returned to work starting on August 17, 1998, planning to increase his hours every two weeks until he was back to a 12-hour work day. Plaintiff returned for evaluation with Dr. Neave on October 1, 1998, and Dr. Neave noted plaintiff was working up to 8 hours a day, but that his back pain returned. She recommended that plaintiff remain at eight-hour days indefinitely and released plaintiff at maximum medical improvement with a 25% permanent partial impairment to his back.
9. Defendant-employer could not accommodate plaintiff's permanent restrictions and he was terminated from employment. Temporary total disability payments were resumed in January 1999. Vocational rehabilitation services were employed by defendant in January 1999.
10. On May 24, 1999, plaintiff called Johnson Neurlogical Clinic with complaints of severe buttock and leg pain. He was prescribed a Medrol dosepak. Plaintiff was next seen on *Page 6 
June 2, 1999, complaining of increasing back pain and leg pain and had a tender sciatic notch. He was prescribed a trial of Neurontin and put on restricted driving.
11. An MRI was performed on June 14, 1999, which showed lumbar spine status post posterior fusion, grade II, of L5-S1 spondylolisthesis, generalized bulging of the annulus fibrosis at L5-S1 producing moderately severe foraminal stenosis bilaterally, and degenerative disk disease at L4-5 with mild bulging of the annulus fibrosis, but no nuclear herniation or stenosis. L-S spine with flexion and extension views revealed stable posterior fusion of L5-S1 for grade 2 L5 spondylolisthesis and moderately severe degenerative disk disease, L4-5, and severe degenerative disk disease, L5-S1. Dr. Neave saw no surgical indications and recommended further conservative treatment, including epidural steroid injections.
12. Plaintiff failed to improve and was eventually referred back to Dr. McDonald, who determined that he was suffering from L4-5 degenerative disk disease and instability, status post L5-S1 fusion with instrumentation. Based on this diagnosis, on January 28, 2000, Dr. McDonald performed a posterior lumbar interbody fusion L4-5 with a Branigan cage with local bone graft, a posterior lateral fusion L4-5, with pedicle instrumentation using the Steffi system and autologous bone graft from the left posterior iliac crest, a repair of a dural tear and a removal of instrumentation from the L5-S1 from plaintiff's previous surgery. Following this procedure, plaintiff was taken out of his job search and once again referred for physical therapy.
13. On April 20, 2000, Dr. McDonald released plaintiff to Dr. Neave for continued follow up and work restrictions. Defendant resumed vocational services. Plaintiff underwent a functional capacity evaluation (FCE) at the Asheboro Rehab Center; however, Dr. Neave disagreed with the results and issued restrictions on July 26, 2000. She placed plaintiff at restrictions of maximum lifting of 50 pounds occasionally, and 10 to 15 pounds on a frequent *Page 7 
basis, with no kneeling, crouching or crawling. In addition, she noted that plaintiff had a marked limitation of rotation, sitting and standing.
14. On August 23, 2000, plaintiff presented to Dr. Neave, complaining of increased back pain and right leg pain. He was noted to have a small fluid collection in paraspinous, but there was nothing more Dr. Neave could offer. Dr. Neave recommended that plaintiff attend a pain management clinic and undergo treatment with a TENS unit or injections, and plaintiff was released from care.
15. Plaintiff enrolled at the Carolina Back Institute on December 19, 2000, and underwent an extensive therapy regimen, culminating in an FCE that placed him at a light physical demand category. The FCE rated plaintiff as having a 25% permanent partial impairment rating. Dr. Neave later saw plaintiff on March 7, 2001, and concurred with the 25% rating issued following the FCE. During this same visit, plaintiff requested another MRI, due to increasing leg pain.
16. The MRI revealed some question about whether one of the pedicle screws on the left at L-4 might be outside the vertebral body; therefore, Dr. Neave referred plaintiff to Dr. McDonald for a consultation. Plaintiff presented to Dr. McDonald on April 10, 2001, and he recommended removal of the plates and screws at the L4-5 fusion. This procedure took place on October 23, 2001. Plaintiff was subsequently seen by Dr. McDonald on November 2, 2001 and released with no change in plaintiff's permanent partial impairment rating.
17. On July 8, 2002, plaintiff presented to Dr. Albert K. Bartko of Guilford Orthopaedic and Sports Medicine Center for an independent medical examination. Dr. Bartko noted that plaintiff primarily complained of non-specific back pain. Based on his examination, Dr. Bartko was not in favor of any surgical procedure for plaintiff, especially given the non-specific *Page 8 
nature of his pain. Instead, Dr. Bartko recommended conservative treatment, including referral to a chronic pain center.
18. On March 13, 2002, plaintiff filed a motion with the Executive Secretary for medical treatment, requesting that he be permitted to treat with pain specialist Dr. William Spillane. The motion was denied. On May 23, 2002, plaintiff filed a Form 33 requesting a hearing.
19. On July 24, 2002, plaintiff presented to Dr. Spillane with complaints of low back pain. Dr. Spillane noted that plaintiff had an antalgic gait due to attempting to avoid pain as he walked. Dr. Spillane opined that plaintiff had "failed low back surgery syndrome," that he should return for a fluoroscope guided caudal epidural steroid injection, and prescribed Vicodin. On August 5, 2002, a Consent Order was issued allowing plaintiff to treat with Dr. Spillane.
20. Plaintiff treated with the Pain Management Center through June 2, 2004, at which time his treatment was discontinued because the Pain Management Center no longer saw patients.
21. Plaintiff's pain management care was taken over by the Pain Clinic at Rowan Regional Medical Center, where plaintiff was seen by Dr. Hans E. Bengston. At plaintiff's first visit with Dr. Bengston on July 21, 2004, he complained of a dull, throbbing, and aching sensation radiating from his low back down his bilateral lower extremities, right greater than left. Dr. Bengston diagnosed plaintiff with failed low back surgery syndrome with bilateral lumbosacral radiculopathy. Dr. Bengston planned to maintain a conservative treatment regimen, with a goal of stabilizing plaintiff's pain.
22. Plaintiff initially received transforaminal epidural steroid injections from Dr. Bengston, but obtained only a temporary benefit. Thereafter, Dr. Bengston maintained plaintiff *Page 9 
on OxyContin and Neurontin for pain. Plaintiff later began counseling with Salisbury Psychiatric Associates for depression. Plaintiff managed his pain with medication for several months.
23. During an April 12, 2005 appointment with Dr. Bengston, plaintiff requested a prescription for a walk-in shower because he had fallen while stepping into the combination shower/tub in his bathroom. Dr. Bengston recommended a walk-in shower and testified that his recommendation was based on plaintiff's safety, stating "And that's [plaintiff feeling unsafe] not something I'm okay with. Let's see what we can do about making that better."
24. On July 14, 2005, rehabilitation consultant Julie Sawyer-Little visited plaintiff's home to conduct a rehabilitation consultation. Following this visit, Ms. Sawyer-Little recommended a number of modifications to plaintiff's home, including removal of existing shower doors, installation of a tub bench, installation of a hand-held shower, relocation of a toilet, installation of raised toilet seat, installation of a new raised sink, creation of a breezeway between plaintiff's existing exit onto his carport and his laundry room, installation of a new set of steps and railings off of the breezeway, and possible installation of a new exit off of the rear of the house. Regarding the walk-in shower specifically, Ms. Sawyer-Little stated that she would still recommend a tub chair in the walk-in shower, primarily for plaintiff's safety and to allow him to be fully independent in the shower. Ms. Saywer-Little testified that if plaintiff had a walk-in shower and tub chair, there would be no need to move the toilet or add a tub bench. In her professional opinion, Ms. Saywer-Little felt that the modifications to plaintiff's shower were reasonably necessary to assist plaintiff in the activities of daily living and to provide him relief from his pain or reduce his disability. *Page 10 
25. Following Ms. Sawyer-Little's visit, plaintiff's wife contacted Byrd Builders, Inc. and had Brad Byrd provide an estimate for modifications to plaintiff's home. In addition to the recommendations of Ms. Sawyer-Little, plaintiff received estimates for the installation of handicap ramps, pouring of a concrete pad and sidewalk, and removal of a bedroom window for the installation of a door. Mr. Byrd estimated that the installation of a walk-in shower in plaintiff's bathroom would cost approximately $3,300.00, but could be more.
26. Plaintiff testified that since reporting the series of falls to Dr. Bengston, he began using a borrowed plastic step stool for entry into the shower. Since that time, he has slipped once. The Full Commission finds that the plastic step stool is insufficient for long-term use and that based upon Dr. Bengston's recommendation, a walk-in shower would enable plaintiff to enter and exit the shower more safely.
27. Plaintiff currently suffers from pain in the back of his legs, numbness and tingling in the legs, weakness in the legs, which progresses in the day, and leg cramps at night, which are consistent with his condition. In addition, plaintiff suffers from depression, chronic pain, fatigue from loss of sleep, and side effects from the medication, which also affect his ability to mentally function. Plaintiff's testimony regarding his limitations is found to be credible.
28. Plaintiff is limited in his ability to engage in physical activity. He states that he is able to sit approximately 30 to 60 minutes, stand 15 to 30 minutes, and walk approximately 30 minutes before experiencing an increase in his discomfort. He also states he has to lie down for pain relief four or five times a day.
29. Dr. Bengston has recommended additional treatment, including an evaluation with Dr. Alexander, neurosurgeon at Wake Forest; radiographic diagnostic testing for plaintiff's condition as recommended by Dr. Alexander or Dr. Bengston in the future; a soft lumbar support *Page 11 
back brace; a TENS unit; ongoing water therapy at such time as he is released to participate in it; medications to be authorized on a timely basis. The Full Commission finds that such treatment is reasonably necessary and appropriate medical treatment for plaintiff.
30. The Full Commission finds that given plaintiff's current condition, he would not benefit from vocational rehabilitation at this time.
31. Defendant has not defended this claim without reasonable grounds.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As of the date of the Deputy Commissioner's Opinion and Award, plaintiff remained unable to work in substantial gainful employment. Therefore, plaintiff is entitled to continue to receive ongoing indemnity benefits at the rate of $433.31 per week. N.C. Gen. Stat. § 97-29.
2. Plaintiff is not permanently and totally disabled, although he remains temporarily totally disabled. Following the evaluation by Dr. Alexander and any subsequent treatment, including the continuing treatment by Dr. Bengston and plaintiff's mental health therapist, plaintiff's condition may improve to the point where vocational rehabilitation would be beneficial to plaintiff. However, at this time vocational rehabilitation is not likely to return plaintiff to suitable work.
3. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure *Page 12 
or lessen the period of disability, including treatment recommended by Dr. Bengston and an evaluation by Dr. Alexander. N.C. Gen. Stat. §§97-2(19); 97-25.
4. "Medical Compensation" is defined by N.C. Gen. Stat. § 97-2(19) as "medical . . . and other treatment . . . as may be reasonably required to effect a cure or give relief . . ." The "other treatment" provision of the Act has been interpreted by our courts as requiring the employer to pay for home modifications necessary to accommodate an injured employee's disabilities. Derebery v. Pitt County Fire Marshal,318 N.C. 192, 347 S.E.2d (1986); Timmons v. North Carolina Department ofTransportation, 123 N.C. App. 456, 473 S.E.2d 356 (1996), aff'd percuriam, 346 N.C. 173, 484 S.E.2d 551 (1997).
5. In the instant case, the Commission finds that the plastic step stool plaintiff uses to enter his bathtub is insufficient for long-term use and that based upon Dr. Bengston's recommendation, a walk-in shower would enable plaintiff to enter and exit the shower more safely. Dr. Bengston's medical recommendation was for a walk-in shower for plaintiff's safety; however, there is no medical evidence to support plaintiff's requests for other home modifications. Thus, the remaining requests are not necessary to accommodate plaintiff's disabilities and are, in many cases, recommended in anticipation of changes in plaintiff's condition that have not yet occurred. Accordingly, plaintiff is entitled to a walk-in shower, but not to the additional home modifications requested. N.C. Gen. Stat. § 97-25.
6. Defendant did not defend this action without reasonable grounds and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain Breeze Restaurant,55 N.C. App. 663, 286 S.E.2d 575 (1982). *Page 13 
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendant shall pay total disability compensation to plaintiff at the rate of $433.31 per week until further Order of the Commission.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved. Every fourth payment shall be paid directly to plaintiff's counsel.
3. Defendant shall provide the following treatment: an evaluation with Dr. Alexander, neurosurgeon at Wake Forest; radiographic diagnostic testing for his condition as recommended by Dr. Alexander or Dr. Bengston in the future; a soft lumbar support back brace; a TENS unit; ongoing water therapy at such time as he is released to participate in it; medications to be authorized on a timely basis. Defendant shall pay plaintiff's medical expenses incurred or to be incurred, in accordance with the provisions of the Act.
4. Defendant shall pay the costs of modifications to plaintiff's bathroom in order to provide plaintiff with a walk-in shower that will enable him to enter and exit the shower more safely.
5. Defendant shall pay the costs.
This 24th day of April, 2007.
 S/____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 14 
CONCURRING:
 S/____________________ BUCK LATTIMORE CHAIRMAN
 S/____________________ BERNADINE S. BALLANCE COMMISSIONER *Page 1